## SPRAGUE v. VOGT et al.
### Civ. No. 604.

District Court, D. Minnesota, Third Division.
Nov. 16, 1946.

M. E. Culhane, of Minneapolis, Minn., for plaintiff.

Frank E. Clinite, of Minneapolis, Minn., for defendant E. C. Vogt.

V. J. Michaelson, of St. Paul, Minn., for defendants J. Lisle Jesmer, Ganlisle Holding Co., and The Jesmer Co.

JOYCE, District Judge.

This action is by the Trustee in Bankruptcy of the Baltimore Investment Company to set aside alleged transfers of the bankrupt's property and claimed to have been made by it without consideration and in fraud of its creditors. The case has been before the Circuit Court of Appeals on an appeal from a summary judgment of dismissal (8 Cir., 150 F.2d 795), and upon being reversed in part was tried here on the merits. The facts are involved and as they are recited in some detail in the Circuit Court's opinion and also in Vogt v. Ganlisle Holding Co., 217 Minn. 601, 15 N.W.2d 91, as to another phase of the case, they will be restated here only in outline form.

For the purposes of this case, the principal asset of the Baltimore Investment Company was an old, large apartment building in St. Paul known as the "Piedmont". In 1938 a controlling interest in this company was acquired by defendant Vogt, who thereafter acted as an officer of the company and manager of the apartment building. It is a fair inference from the evidence that at that time the apartment was not a successful business venture. The building was run down and its furnishings were worn and old. Its assessed valuation was $75,000. The building was not fully tenanted and apparently not all the apartments were habitable. There were $38,000 delinquent taxes, unpaid gas, water and light bills, unpaid insurance premiums and numerous other debts. There was also a mortgage in the face amount of $8,000 to a Mrs. Burns, which was long overdue. This mortgage was foreclosed January 22, 1940 and the Piedmont sold at foreclosure sale to the mortgagee for about $11,000. It is the title subsequently acquired through this foreclosure that is under attack here and the real issue in this case is whether the Baltimore Investment Company ever redeemed from this foreclosure sale. (It is unimportant here but the evidence shows that there was a receivership proceeding in state court as well as a prior bankruptcy, both of which were dismissed).

In the meantime the defendant Vogt was seeking ways and means to salvage something from the financial wreckage and on December 31, 1940 entered into a contract with the Ganlisle Holding Company which has been designated Exhibit "A" (The Ganlisle Holding Company was a family corporation dominated by J. L. Jesmer, as was the Jesmer Company, who are all named as defendants. There is no issue on this and

for the sake of brevity Jesmer and his corporation will be designated as "Ganlisle"). This contract is lengthy, and is fully discussed together with the inferences to be drawn from it and the supplemental contract in Vogt v. Ganlisle Holding Co., 217 Minn. 601, 15 N.W.2d 91. Briefly, Exhibit A provides that Ganlisle will convey some land in Wisconsin known as the Pine Island Property together with its equities in four duplexes in Minneapolis and an apartment building in St. Paul on Dayton Avenue to Vogt or his nominees. The contract recites that Ganlisle is attempting to acquire title to the Piedmont by purchasing the sheriff's certificate from Mrs. Burns, acquiring the stock of the Baltimore Investment Company, and that when it had done so would obtain a $25,000 loan, to be secured by a first mortgage on the real and personal property, the money to be used to clear the title to the property. At that time, the personal property was subject to a chattel mortgage in favor of Vogt and one Hart, another officer of the Baltimore Investment Company, which Vogt agreed to satisfy. The Ganlisle Company then agreed that if it acquired the Piedmont Apartment under such conditions it would sell the property to Vogt on terms not here material. It should be kept in mind that this contract, Exhibit A, was executed December 31, 1940 while the year of redemption from the Burns mortgage foreclosure sale would expire January 22, 1941.

Ganlisle entered into an option agreement with Burns on January 9, 1941, for the purchase of the sheriff's certificate. On January 22, 1941, the date when the year of redemption would expire, the parties executed a contract for deed which contained this significant language: "It is understood and agreed between the parties hereto that one of the Vendors, Dorothy A. P. Burns, is the owner of a sheriff's certificate of foreclosure sale of said premises, and that her interest in and to said premises is derived from said certificate; that the time for redeeming from said foreclosure will expire on the date hereof, but that said time of redemption may be extended by the giving of a notice of intention to redeem by subsequent lienors, and it is expressly understood and agreed that this contract shall not be effective until the time for redemption from the foreclosure shall expire as to all parties who have the right to redeem therefrom. If no redemption shall be made from said foreclosure by any person having a right to redeem therefrom, then this contract shall be in full force and effect, and the Vendee shall be entitled to the possession of said premises from and after the time of the expiration of redemption as to all parties in interest." It is apparent from the above quoted language that the contract between Burns and Ganlisle recognized the right of redemption that either the Baltimore Investment Company or its creditors had.

On February 26, 1941, an order was entered by the District Court of Ramsey County pursuant to an application of Mrs. Burns for a new certificate of title. This order recites that the Baltimore Investment Company and many of its creditors were served with notice of the hearing, that there was no objection to the application, that the Burns mortgage was duly and legally foreclosed, that the time for redemption had expired and there had been no redemption nor no notice of an intention to redeem and a certificate of title was issued to Mrs. Burns subject to the contract for deed to Ganlisle above referred to. At the least, this order is evidence that the creditors of the bankrupt, for whose ultimate benefit this action is brought, had an opportunity to redeem from the foreclosure or to object to transfer of title and did not do so.

Chronologically, the next important events occurred in May, 1941. Ganlisle had been in possession of the Piedmont since January 21st and was operating it. On May 22, 1941, Ganlisle entered into another or a supplemental contract with "E. C. Vogt, Agent", which has been designated Exhibit "D". This is a lengthy document but generally it changed the agreement of December 31, 1940 between the same parties (Exhibit "A") by reciting that certain conditions had changed in that Ganlisle could not acquire the Piedmont for the price originally contemplated but could acquire it for an increased price and therefore the price at which Ganlisle agreed to sell to Vogt was increased. This contract was the subject of the lawsuit culminating in Vogt v. Gan-

lisle Holding Co., supra, where the Supreme Court held it to be not a contract of sale but an option contract which had expired by its terms. December 1, 1942. Vogt therefore then lost any rights he had under the contract so the terms upon which he might have purchased from Ganlisle are now immaterial.

Contemporaneously with the execution of Exhibit "D", Burns deeded to Ganlisle and took back a mortgage for $11,000 on the real and personal property in favor of Mrs. Burns and A. B. Christofferson, an attorney, which became a second mortgage on the premises. The first mortgage was held by the Minnesota Federal Savings and Loan Association for the $25,000 loan above referred to and also covered the personal as well as the real property. When this suit was commenced Mrs. Burns and the Minnesota Federal Loan & Savings Association were named as codefendants. All the defendants moved for summary judgment and dismissal. The motion to dismiss was sustained and the motion for summary judgment was denied. Upon appeal the Circuit Court affirmed in part and reversed in part saying:

"A majority of this court is of the opinion that the claim of the plaintiff that he has rights in the real property in suit superior to the rights of the defendants Minnesota Federal Savings and Loan Association and Mrs. Burns under their respective mortgages is without substance, and that in so far as the summary judgment disposes of that claim the judgment is not erroneous. * * *

"The judgment appealed from is affirmed in so far as it determines that the mortgage liens of the defendants Minnesota Federal Savings and Loan Association and Mrs. Burns upon the real property in suit are as asserted by those defendants in their answers. The judgment is reversed in so far as it disposes of other issues, and the case is remanded for further proceedings not inconsistent with this opinion." (150 F.2d page 801).

It should be noted that the Circuit Court's decision is limited to the sustaining of the validity and priority of these mortgages only in so far as they are liens on the real property. Their status as to being liens on the personal property must be decided here although neither Mrs. Burns nor the Minnesota Federal Savings and Loan Association appeared in the trial of this case. Although the facts involving the real and personal property (which consisted largely of the furnishings in the apartment) are intertwined, separate issues are presented and will be discussed separately.

From what has been recited it is plain that Ganlisle holds a prima facie clear record title to the realty through a deed from the purchaser at a foreclosure sale of a valid mortgage. In fact the validity of the original mortgage is not questioned. Plaintiff recognizes this and his attack on the transactions is on the theory that the Baltimore Investment Company actually redeemed from the Burns mortgage although the record shows otherwise. Plaintiff relies principally on the contracts between Ganlisle and Vogt (Exhibits "A" and "D") and the option contract from Burns to Ganlisle executed January 9, 1941, before the year of redemption had expired, to acquire the sheriff's certificate after the time for redemption had passed.

As to Exhibits "A" and "D" it is not at all clear that these contracts were entered into by or for the benefit of the Baltimore Investment Company. They are signed by "E. C. Vogt, Agent". In a previous proceeding in state court defendant Vogt testified that he executed these contracts as agent for the Baltimore Investment Company. But there was also a corporation "E. C. Vogt, Inc." and Vogt personally, all having interests in the Piedmont Apartments. If the contracts Exhibits "A" and "D" had been performed and Vogt "as agent" had been able to purchase the apartment from Ganlisle it is only a matter of speculation whether and to what extent the Baltimore Investment Company would have benefited. If these contracts were actually made for and by the Investment Company, why they were not executed in their names has never been explained.

 To support its claim that there was, in equity, a redemption from the foreclosure sale plaintiff relies on the fact that Vogt controlled the corporation and

by his acts prevented the corporation from redeeming. There is no evidence in support of this claim except Vogt's testimony that it was "understood" that there would be no redemption. From the evidence as to the value of the property, including its assessed valuation, and the burden of indebtedness on the corporation, it is reasonably clear that it was a financial impossibility for the corporation to redeem. Plaintiff relies on Banning v. Sabin, 51 Minn. 129, 53 N.W. 1, to support its theory that there was an equitable redemption. In that case there was a judgment against a man named Baker who owned mortgaged property. The land was sold at execution sale and afterwards an action was commenced to foreclose the mortgage. Before the time for redemption from the execution sale had expired Baker made a deal with one Armstrong whereby Armstrong was to purchase the sheriff's certificate, hold it until the redemption period expired, and then deed it to Baker or his nominees for what was paid for the sheriff's certificate plus a bonus of $500—which would be much less than the land was worth. Baker also executed a deed to Armstrong which was placed in escrow to be delivered to Armstrong if Baker failed to reimburse him after the redemption period expired. Baker did fail to comply with the terms of the contract. Baker's deed was delivered to Armstrong and of course Armstrong never conveyed back to Baker. The suit was between persons claiming title through Armstrong and those claiming through the purchaser at the foreclosure sale. It was the latter's position that the deal between Baker and Armstrong was in effect a redemption by Baker and so did not affect the rights of the purchaser at the subsequent foreclosure sale. The court agreed with this contention, holding, in effect, that Armstrong had only succeeded to Baker's redemption rights and had only an equitable mortgage as security for the debt. In other words, that there had been a "practical redemption" by Baker. The reason for so holding was apparently the clear testimony of the attorney who engineered the transaction which is quoted at length in the opinion, that the real nature of the transaction was Baker's purpose to avoid the consequences of redemption. The distinguishing feature between this case and the one at bar is the absence of any clear testimony here that the Baltimore Investment Company contracted with Ganlisle for the purpose of avoiding a legal redemption from the Burns mortgage. As previously mentioned, it is not even clear that the Baltimore Investment Company was a party to Exhibits "A" and "D", and assuming that it was and that the contracts were for its benefit, there is no evidence upon which the court could base a finding that Ganlisle was only acting for it so as to have redeemed from the foreclosure sale. The mere fact that Ganlisle purchased the sheriff's certificate before the time to redeem expired and contemporaneously entered into a contract to sell the premises to the former owner would not be enough to hold the transaction an equitable mortgage. Kreuscher v. Roth, 152 Minn. 320, 188 N.W. 996, 997, presented that situation. The owner of a life estate in land upon which there had been a mortgage foreclosure sale entered into a contract with Roth who purchased the sheriff's certificate during the redemption period and sold the land on contract to the former life tenant for the cost of the sheriff's certificate. In sustaining the finding that no equitable mortgage resulted the court said: "The parties might have made a contract that the title stand in Roth as security; or they could agree, as the court found that they did, that Roth should acquire title and Peyer should take a contract of purchase. Banning v. Sabin, 51 Minn. 129, 53 N.W. 1; and King v. McCarthy, 50 Minn. 222, 52 N.W. 648, relied upon by the plaintiffs, holding particular transactions equitable mortgages, do not control under the facts found."

In the case at bar the Minnesota Supreme Court has already held the contract between Ganlisle and Vogt to be an option contract. There is no justification here for holding otherwise and it is my conclusion that Ganlisle holds the legal title to the realty involved through its purchase of the Burns certificate and that there was no redemption by or on behalf of the Baltimore Investment Company.

There remains the question of the personal property. Throughout the negotiations between the various parties the real and personal property were considered together as it would be impracticable to separate the apartment furnishings from the apartment building. However, the original Burns mortgage covered only the building and Ganlisle's title to the personal property is not derived from this source. The personal property was inventoried in the receivership proceedings at $10,406.45 and was subject to a chattel mortgage of $11,000 in favor of Vogt and Hart, both then officers of the company. As part of the deal between Vogt and Ganlisle this mortgage was assigned by Vogt and Hart to Ganlisle, satisfied of record and in addition a bill of sale was executed to Ganlisle by Vogt and Hart on behalf of themselves and the Baltimore Investment Company, and thereafter the $25,000 mortgage to Minnesota Federal Savings and Loan Association was placed on both the real and personal property as well as the second mortgage to Mrs. Burns and Christofferson for $11,000. Whether this transfer was without consideration to the Baltimore Investment Company depends largely upon (1) the validity of the Vogt and Hart chattel mortgage and (2) whether the contracts with Ganlisle were for the benefit of the Baltimore Investment Company. The only evidence on the first point is testimony by Vogt that the company did owe him and Hart a lot of money and the mortgage was placed on the personal property for security. As to the second point, if the contracts with Ganlisle were for the benefit of the Baltimore Investment Company, as the plaintiff's theory of the case presupposes, then the Investment Company benefited to the extent that it acquired the right under the option contracts referred to to purchase the property on the conditions specified from Ganlisle. The fact that it did not exercise the option and cannot now do so would not alter the fact that the right to purchase was of some value at the time the contract was entered into in 1941. As a matter of fact the value of the personal property as appraised in the receivership proceeding was $10,406.45. This figure includes approximately $4,000 as the value of the refrigerators which had been installed in the Piedmont. There is evidence that there was due on a conditional sales contract for the purchase of these same refrigerators the sum of $4,000. Therefore, the value of the personal property which would be subject to the Vogt and Hart mortgage would be worth only approximately $6,000. This mortgage was in the amount of $10,000 and assuming it to be a valid mortgage it is clear that the Baltimore Investment Company lost nothing by the transfer of the personal property.

It is my conclusion that plaintiff has failed to sustain his burden of proving that the transfers of either the real or the personal property were conveyances in defraud of creditors.

Findings of Fact and Conclusions of Law will be filed in keeping with this memorandum which will become a part thereof.